# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DEON DRAKE,                        )       CASE NO. 1:17CV2404

              )

        Plaintiff,        )

              )

        v.            )       MAGISTRATE JUDGE

              )       JONATHAN D. GREENBERG

NANCY A. BERRYHILL,      )

      Acting Commissioner   )

      of Social Security,    )       **MEMORANDUM OF OPINION**

              )       **AND ORDER**

        Defendant.     )

Plaintiff, Deon Drake ("Plaintiff" or "Drake"), challenges the final decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for Child's Insurance Benefits ("CIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is VACATED and the case REMANDED for further consideration consistent with this decision.

## I.  PROCEDURAL HISTORY

In November 2014 and March 2015, respectively, Drake filed applications for SSI and CIB, alleging a disability onset date of October 1, 1992 and claiming he was disabled due to

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

bipolar disorder and asthma.[1] (Transcript ("Tr.") at 19, 104-105, 129, 313-318.) The applications were denied initially and upon reconsideration, and Drake requested a hearing before an administrative law judge ("ALJ"). (Tr. 19, 332-334, 348-349, 377-379.)

On January 12, 2016, an ALJ held a hearing, during which Drake, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 380-425.) On January 28, 2016, the ALJ issued a written decision finding Drake was not disabled. (Tr. 19-34.) The Appeals Council granted Drake's request for review because "the Administrative Law Judge's decision does not evaluate some of the relevant medical evidence." (Tr. 11.) On September 27, 2017, the Appeals Council issued a written decision in which it adopted the ALJ's findings and conclusions and found Drake was not disabled. (Tr. 11-14.)

On November 16, 2017, Drake filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 14, 17, 18.) Drake asserts the following assignments of error:

> (1)    The Appeals Council erred when it failed to find that Plaintiff has an intellectual disability, given that the Agency previously awarded benefits to him on the basis of this impairment.

---

[1]As discussed *infra*, the Appeals Council found that "the claimant had previously been found disabled during the period at issue." (Tr. 11.) Although remarking that "we could not secure his prior file," the Appeals Council stated that "[c]omputerized records indicate that the claimant was found disabled under section 12.05C of Appendix 1 to 20 CFR Part 404." (*Id.*) The Appeals Council explained that "the mental impairments listed in Appendix 1 have changed, but at the time the claimant was found disabled, section 12.05C described mental retardation with IQ scores between 60 and 70, as well as another significant impairment." (*Id.*) Neither the Appeals Council, the ALJ, or the parties indicate precisely when Drake was previously found disabled. However, the Commissioner suggests the prior award was in 1992, when Drake was 13 years old. (Doc. No. 17 at 15.) The administrative record relating to Drake's previous application and award of disability benefits is not before this Court and apparently cannot be found. *See* Doc. No. 17 at 15 ("The prior folder from 1992 is simply not available.")

(2)     Leaving aside Plaintiff's intellectual disability, the ALJ's analysis of Plaintiff's mental impairments and the medical opinions regarding his mental impairments are contrary to law and not supported by substantial evidence.

(3)     The Appeals Council's failure to conduct the analysis mandated when substance abuse is a significant medical condition is also error requiring remand.

(Doc. No. 14.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Drake was born in March 1979 and was thirteen (13) years old on his alleged disability onset date and thirty six (36) years-old at the time of his administrative hearing, making him a child on his onset date and a "younger person" on the date of his hearing, under social security regulations. (Tr. 32-33.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). He has a 12th grade education[2] and is able to communicate in English. (Tr. 33.) He has no past relevant work. (*Id.*)

### B.    Relevant Medical Evidence[3]

On May 28, 2012, Drake was transported to the emergency room ("ER") after having been struck in the head with a machete. (Tr. 219.) Examination revealed a deep laceration to his scalp. (*Id.*) A CT scan of Drake's head and neck showed no acute injury. (*Id.*) Drake's scalp laceration was repaired and he was admitted overnight for observation due to significant blood

---

[2] Drake has given conflicting information regarding his level of education. During a consultative examination, he initially stated that he completed the 12th grade, but later indicated he dropped out of school. (Tr. 191.) In treatment notes, Drake reports having completed only the 9th grade. (Tr. 206.) During his hearing, Drake insisted he had graduated from high school. (Tr. 389-390.)

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

loss.  (Tr. 218-219.)  Treatment records indicate Drake was verbally abusive to hospital staff.  (*Id*.)  He was discharged the following day in improved condition.  (Tr. 218.)

On June 13, 2012, Drake returned to the hospital to have his staples/sutures removed.  (Tr. 214-215.)  He reported a headache, which he rated a three on a scale of ten.  (*Id*.)  Several months later, on September 19, 2012, Drake complained of persistent headaches.  (Tr. 212-213.)  On that date, he rated his pain an eight on a scale of ten.  (*Id*.)  He was prescribed Percocet and referred to the Concussion Clinic.  (Tr. 213.)

The record reflects Drake was incarcerated from 2013 until early 2015.  (Tr. 257.)  On January 13, 2015, Drake underwent a prisoner assessment at the Cuyahoga County Corrections Center.  (Tr. 210-211.)  Physical examination findings were normal.  (*Id*.)  On psychiatric examination, Drake was oriented to person, place, and time, with normal behavior, mood, affect, judgment, and thought content.  (*Id.*)

On March 24, 2015, Drake presented to the ER with complaints of headaches "once in awhile after being stabbed in the head with a machete."  (Tr. 247-250.)  He reported "an achy throbbing headache 8/10 and vision changes" for the past two days.  (Tr. 248.)  Physical examination findings were largely normal, aside from headaches, mild tachycardia, and back pain. (Tr. 248-249.)  On psychiatric examination, Drake was alert and oriented to person, place, and time, and negative for confusion and agitation.  (Tr. 248-249.)  He had normal mood, affect, and behavior.  (Tr. 249.)  Drake was treated with a "headache cocktail" and discharged in improved condition with plans to follow up with a neurologist and primary care physician.  (Tr. 249-250.)

Shortly thereafter, on March 26, 2015, Drake underwent an Adult Intake Assessment at the Centers for Families and Children (hereinafter "the Center"). (Tr. 206- 208.) His chief complaint was as follows: "I need mental help. I have nightmares, seeing ghost[s], talk to self, hearing voices– deceased mother talks to him, devil talks to him, can't sleep. I'm calming down right now but it keeps going on and off." (Tr. 206.) He reported that he "sometimes" thought about "doing something" to himself, but "has not tried." (*Id*.) Drake indicated he began drinking alcohol at the age of 13 and currently drank "a couple of six packs per day." (*Id*.) He also reported smoking marijuana since the age of 13 and currently smokes a "couple hits off a joint– 1x month." (*Id*.)

With regard to his mental health history, Drake indicated he had been receiving SSI since he was a child. (*Id*.) He stated he "was in special education classes from 1̀-8th grade, 9th grade education." (*Id*.) Drake stated he had not been on medication "for some time." (*Id*.) Drake reported the following symptoms: "poor sleep (2-3) hours of interrupted sleep, intrusive nightmares and thoughts, anger, increased stress, anxiety, mood swings, feeling as though persons are out to harm him, difficulty being in large crowds." (*Id*.)

Examiner Patricia Rucker (whose title is not identified) diagnosed bipolar I disorder, most recent episode mixed, moderate; posttraumatic stress disorder; and polysubstance

dependence. (Tr. 207.) She assessed a Global Assessment of Functioning of 40,[4] indicating

major impairment. (*Id*.)

Drake returned to the Center on May 1, 2015. (Tr. 256-259.) He reported he was "trying

to get my SS benefit, medicine, and treatment." (Tr. 256.) Drake indicated he has "a mental

problem fighting with people" and "does not like being around people since he was little." (*Id*.)

He complained of hallucinations "where he sees his deceased mother and/or the devil and they

tell him what to do." (*Id*.) Among other things, his hallucinations have told him to walk outside

naked and to kill himself. (*Id*.) Drake also reported impaired sleep, racing thoughts, poor energy

and motivation, nightmares, and poor concentration. (*Id*.) He indicated he did not currently

have suicidal thoughts but that he "tried to cut [his] wrists but instead ran out of the house

naked." (*Id*.)

Drake reported extensive alcohol use and indicated he "needs an eye opener in [the

morning] and shakes if he does not get beer." (Tr. 257.) He stated he had participated in

substance abuse treatment in prison (2 to 3 times/ week for six months) and attended AA

meetings daily for two months. (*Id*.) Drake stated he "has been on SSI since childhood until age

34– went to jail for 2 years– must reapply." (*Id*.) He reported blurry vision, migraines,

_____

[4] The GAF scale reports a clinician's assessment of an individual's overall level
of functioning. An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments. A GAF score between 31 and 40 indicates
some impairment in reality testing or communication OR major impairment in several
areas, such as work or school, family relations, judgment, thinking or mood. A score
between 41 and 50 indicates serious symptoms or any serious impairment in social,
occupational or school functioning. A recent update of the DSM eliminated the GAF
scale because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5)
at 16 (American Psychiatric Ass'n, 5th ed., 2013)

dizziness/vertigo, and loss of balance. (Tr. 258.) His examiner (who is not identified) assessed as follows:

> [H]ere for evaluation of hallucinations, problems getting along with people and fighting, drug and [alcohol] addiction. He has three prison numbers for drugs and a history of fighting people for no reason except that they make him mad. Living with fiancé and her mother at present time. Was released from [prison] in February 2015 and has been drinking about 12 beers daily since then. He smelled of ETOH during the visit. Will treat this client as a bipolar as he had problems in school, had an IEP, overall difficulty getting along with people. He never went beyond the 9th grade so there are considerable limitations present cognitively. * * *

(*Id.*) Drake was diagnosed with bipolar disorder, PTSD, polysubstance dependence, and antisocial personality disorder; and again assessed a GAF of 40. (Tr. 239-240, 258-259.) He was prescribed Risperdal and advised to wean himself off of alcohol and marijuana and attend AA meetings three times per week. (Tr. 258-259.)

On May 15, 2015, Drake presented to Kathleen Christy, N.P.[5] (Tr. 243-244.) He reported the medication was not helping with his hallucinations, stating that dead people and the devil were talking to him. (*Id.*) Drake also reported thoughts of suicide (including cutting his throat) and stated the "knives have been locked in a safe at home." (*Id.*) He reported "all right energy; 50/50 concentration, [and] not that good appetite." (*Id.*) Drake also stated he was down to 2- 3 beers per day. (*Id.*) Ms. Christy prescribed Zoloft for PTSD and depression, and Depakote for mood disturbance. (*Id.*)

Drake returned to Ms. Christy on June 18, 2015. (Tr. 267-268.) He reported he had quit drinking "about a month ago" and was having more symptoms. (*Id.*) Specifically, Drake

---

[5] The Court notes that, in some treatment notes, Ms. Christy is referred to as a psychiatry resident and in others as a nurse practitioner. *Compare* Tr. 244, 264. The Commissioner describes Ms. Christy as a nurse practitioner and Drake does not object. Accordingly, the Court will consider Ms. Christy a nurse practitioner for purposes of this decision.

7

endorsed hallucinations (including hearing "messages from tv/radio and thinks he has special powers"); "off the hook" anger, and suicidal thoughts. (*Id.*) He also reported poor energy, irritability, crying, and "sometimes having problems following directions." (*Id.*) Ms. Christy increased his Zoloft dosage; continued his Depakote and Risperdal; and prescribed Invega Sustenna injections.[6] (*Id.*)

On June 29, 2015, Drake presented to registered nurse Kourtney Monteiro, R.N., for his Invega Sustenna injection. (Tr. 270-271.) Nurse Monteiro found that Drake "appears anxious, irritable, does not easily engage in conversation, is guarded." (*Id.*) He reported hallucinations, including that "he hears voices and messages from tv." (*Id.*) Drake also complained of mood disturbance and poor sleep. (*Id.*) He denied drug or alcohol abuse. (*Id.*) Nurse Monteiro administered Drake's first injection. (*Id.*)

The record reflects Drake either cancelled or failed to show for five appointments, on June 22, July 10, July 13, July 17, and July 20, 2015. (Tr. 273, 272, 274-275, 276.)

On July 30, 2015, Drake returned to Ms. Christy. (Tr. 277-278.) He stated he was "doing better" since his injection but nonetheless complained of poor sleep, "so-so" appetite, "up and down" motivation, and preoccupation with voices. (*Id.*) Ms. Christy noted Drake was "still running out naked from house." (*Id.*) He reported having been sober for four weeks. (*Id.*) Ms. Christy indicated Drake needed to restart the protocol for injections, and increased his dosage of Zoloft. (*Id.*)

_____

[6]According to its website, Invega Sustenna is a prescription medication given by injection that is used to treat schizophrenia in adults. *See* https://www.invegasustenna.com.

That same day, Drake presented to Nurse Monteiro for his "loading dose" of Invega Sustenna. (Tr. 279-280.) He complained of intermittent hallucinations but "appear[ed] more engaged today than in previous encounters." (*Id*.) Nurse Monteiro noted Drake "remains a poor historian, providing poor content in response to questions asked by this nurse." (*Id*.) Drake returned to Nurse Monteiro on August 6, 2015 for his second Invega Sustenna injection. (Tr. 281-282.) He reported "resistant" auditory hallucinations, but stated he was able to "mostly stay cool." (*Id*.) Drake did indicate "some of the voices tell him to kill himself." (*Id*.) He denied drug or alcohol abuse. (*Id*.)

The record reflects Drake either cancelled or failed to show for appointments on August 18 and 26, 2015. (Tr. 283-284, 286.) He was advised that "he cancels too often and will not be put in the schedule unless [he] provides the date and time." (Tr. 285.)

On September 3, 2015, Drake returned to Ms. Christy with complaints that he was "still seeing things" and "still hearing voices." (Tr. 287-288.) He indicated he was "listens to voices and acts on them at times." (*Id*.) Drake also stated he was irritable and "still has a mean streak." (*Id*.) He reported he had "stopped drinking totally." (*Id*.) Ms. Christy increased his Invega Sustenna dosage and continued him on his Zoloft, Depakote, and Risperdal. (*Id*.)

On that same date, Drake presented to Nurse Monteiro for his injection. (Tr. 289-290.) She noted Drake "appears restless, anxious, but is cooperative, engaged and replies to questions asked." (*Id.*) His affect was flat and he did not make good eye contact. (*Id.*) Drake reported "up and down" moods and indicated he did not feel any better on the medication. (*Id.*)

On September 23, 2015, Drake's Community Psychiatric Support Treatment ("CPST")[7] provider, Amanda Teddleton, QMHS, contacted him about his missed appointments. (Tr. 294.) Drake reported his brother was in the hospital "due to being shot in the back 5 times." (*Id*.) He indicated he would make an appointment. (*Id*.) Several days later, on September 29, 2015, Drake spoke on the phone with Ms. Teddleton and "insisted he needs more help [with housing, food stamps, and social security] than he's been receiving." (Tr. 295.) Ms. Teddleton explained that he had missed five appointments, but made plans to meet with Drake later that week. (*Id*.) Drake failed to appear for appointments with Ms. Teddleton and Nurse Monteiro on October 1, 2015. (Tr. 296, 297.) Ms. Teddleton noted that Drake "often insists [on] help from [her] but does not show for appointments," stating "the effectiveness of client's sessions is based on client's engagement and cooperation." (Tr. 297.)

The record reflects Drake failed to appear for appointments on October 2, 8, and 9, 2015. (Tr. 298-300.) On October 12, 2015, Drake contacted the Center with complaints that Ms. Teddleton "was not helping him." (Tr. 301.) He was reminded that "he needs to keep an appointment for anyone to help him." (*Id.*)

On October 15, 2015, Drake returned to Ms. Christy. (Tr. 302-303.) He reported "still hearing voices and seeing things; sometimes listens to voices and running out [of the] house naked– everything 'pretty much the same.'" (*Id*.) Ms. Christy noted he had a flat affect and was

---

[7] According to Ohio Administrative Code § 5122-29-17, "Community Psychiatric Supportive Treatment ('CPST') services provides an array of services delivered by community based, mobile individuals, or multidisciplinary teams of professionals and trained others. * * * CPST services should be focused on the individual's ability to succeed in the community, to identify and access needed services; and to show improvement in school, work, and family and integration and contributions within the community."

tired from his medications.  (*Id.*)  She stated "some psychosis was still present" and indicated

Drake was "basically confused about what he is to do and when he is to get injection." (*Id.*)

On that same date, Ms. Christy completed a Mental Impairment Questionnaire regarding

Drake's mental functioning.  (Tr. 254-255.)  She noted her first contact with Drake was in May

2015, and stated she had had five contacts with him as of the date of her opinion.  (*Id.*)  She

identified diagnoses of bipolar I and PTSD, and stated he was taking Zoloft, Depakote,

Risperdal, and Invega Sustenna.  (*Id.*)  When asked to identify clinical findings in support of her

opinion, Ms. Christy noted audio and visual hallucinations (specifically, that he sees the devil

and follows commands) and that he "can't be around people."  (*Id.*)  She characterized Drake's

prognosis as "guarded." (*Id.*)

Ms. Christy concluded Drake was "seriously limited, but not precluded"[8] from (1)

understanding and remembering very short and simple instructions; and (2) interacting

appropriately with the general public.  (*Id.*)  She found he was "unable to meet competitive

standards" in the following areas:

- Carry out very short and simple instructions;

- Perform at a consistent pace without an unreasonable number and length of rest
  periods;

- Remember locations and work-like procedures;

---

[8] The form completed by Ms. Christy defined the term "seriously limited, but not precluded" as meaning the "ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances." (Tr. 254.)  The term "unable to meet competitive standards" means the claimant "cannot satisfactorily perform this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting."  (*Id.*)  Finally, the term "no useful ability to function" is defined as "an extreme limitation, means [the claimant] cannot perform this activity in a regular work setting."  (*Id.*)

- Understand and remember detailed instructions;

- Ask simple questions or request assistance;

- Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

- Set realistic goals or make plans independently of others.

(*Id*.) Ms. Christy further concluded Drake had "no useful ability to function" in the following areas:

- Carry out detailed instructions;

- Maintain attention and concentration for extended periods;

- Perform activities with a schedule;

- Manage regular attendance and be punctual within customary tolerances;

- Sustain an ordinary routine without special supervision;

- Work in coordination with or in proximity to others without being distracted by them;

- Complete a normal workday or workweek without interruptions from psychologically based symptoms;

- Accept instructions and respond appropriately to criticism from supervisors;

- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- Respond appropriately to changes in the work setting;

- Be aware of normal hazards and take appropriate precautions.

(*Id*.) Finally, she found Drake would be absent from work two to three days per week as a result of his impairments or treatment, and would likely be off-task 50% of the day due to his symptoms. (*Id.*)

The record reflects Drake missed appointments with his CPST, Ms. Teddleton, on October 27, 2015 and November 2, 2015. (Tr. 306, 311.)

Several weeks later, on November 2, 2015, Drake presented to Nurse Monteiro for his Invega Sustenna injection. (Tr. 309-310.) Nurse Monteiro noted Drake "presents as restless, slightly irritated during this encounter." (*Id*.) She noted that he complained of waiting for over an hour but was "apparently unaware of recent time change [and] professes not knowing what daylight savings time is." (*Id*.) Drake continued to report hallucinations and poor sleep, but denied drug or alcohol abuse. (*Id*.)

**C.    State Agency Reports**

**1.    Mental Impairments**

On February 26, 2015, Drake underwent a psychological consultative examination with Amber Hill, Ph.D. (Tr. 190-201.) Drake's fiancé also attended and appears to have provided some information to Dr. Hill.[9] (Tr. 191.) When asked to identify his chief complaint, Drake stated: "I got hit in my head. I be hearing voices. I be having nightmares." (*Id*.) He provided conflicting reports regarding his educational history, initially stating he completed high school but then (at his fiancé's prompting) indicating he dropped out in the 9th grade. (*Id*.) Drake stated he received special education services and earned "decent" grades in school. (*Id*.) He reported a "history of legal involvement," including three possession charges related to cocaine. (Tr. 192.)

---

[9] During the hearing, Drake's counsel objected to Dr. Hill's report on the grounds that Drake's fiancé was present and improperly provided information in response to questions. (Tr. 385.) He also objected to the state agency psychologists' opinions to the extent they were based on Dr. Hill's examination. (*Id*.) In the decision, the ALJ overruled the objection, finding "no evidence that the fiancee's presence affected the assessment or otherwise prejudiced the claimant." (Tr. 29.) Drake does not challenge this particular finding in the instant action.

Drake indicated he was incarcerated from January 2013 until February 2015. (*Id*.) He reported he had been court ordered to seek alcohol and drug treatment. (*Id*.) With regard to his substance abuse history, Drake reported (in relevant part) as follows:

> The claimant states that he first tried alcohol at the age of 13 and had used every day "until he went to jail," per his fiancée's report. The claimant states that he last used alcohol yesterday. When asked how much, both the claimant and his fiancee stated "a lot." The claimant states that he drank 24 beers plus had liquor and also drinks wine. The claimant states that he first tried marijuana at the age of 12 and used every day until he went to jail, with his last use being yesterday where he had one joint. The claimant states that he first tried cocaine at the age of 12 and at most was using almost every day until he went to jail. The claimant states that he has not used cocaine since he became incarcerated in 01/13. The claimant states that he has never tried any additional substances, but did participate in court ordered drug treatment at the Manor House for 90 days.

(Tr. 192-193.)

With regard to his daily activities, Drake stated he was able to dress, bathe, and groom himself independently. (Tr. 194.) He also reported he cooks and prepares food in the microwave, does some "general cleaning," and is able to take the bus, manage his own money, and go to the store. (*Id*.) Drake indicated his hobbies and interests include going out to eat and going to the park. (Tr. 191.) He stated he spends the majority of his day going to the park, watching TV, listening to music, and talking on the phone. (*Id*.)

Drake reported no treatment for mental health problems as a child, adolescent or adult. (Tr. 193.) He indicated he was not currently receiving mental health treatment and had never had any psychiatric hospitalizations. (*Id*.) When asked if he was experiencing any mental health problems, Drake stated "sometimes people be talking to me at night and I be hearing voices." (*Id*.) Later, he indicated the voice "sounds like someone I know," stating that he hears a voice in his head at night that sounds like his brother and often talks to him about his deceased mother.

(*Id.*) Dr. Hill determined (without further explanation) that Drake's report of hallucinations "is not believed to be true psychosis and is believed to be a result of his tendency to intentionally produce false or grossly exaggerated symptoms." (*Id.*)

On mental status examination, Dr. Hill found Drake "appeared to be cooperative but it was evident that the claimant was purposefully attempting to perform poorly." (Tr. 196.) She noted he had "appropriately focused" eye contact, slight restricted affect, neutral mood, and no evidence of hallucinations, delusions, or paranoia during the evaluation. (Tr. 194-195.) His speech was intelligible and "he demonstrated overall adequate expressive and receptive language skills." (*Id.*) However, Dr. Hill noted his speech was "not especially goal directed." (*Id.*) She found his insight and judgment were intact but poor. (Tr. 196.) With regard to his cognitive functioning, Dr. Hill noted as follows:

> His sensorium appeared clear. He was oriented to person, place, and time, although when initially asked the year claimant responded "2013." However, prior to the mental status exam tasks, the claimant was able to correctly report that he had been incarcerated from 2013 until 2/15, which suggests that he does know the correct year. The claimant then states "I be having migraine headaches" ever since he had a head injury two or three years ago. His attention and concentration appeared intact. However, it is believed that the claimant was purposefully providing incorrect responses. When asked what was 2 + 2, he responded 5, although the claimant was then able to correctly count the number of fingers that the evaluator held up. When asked 4 + 4, the claimant responded 6, but then was able to correctly count the number of fingers the evaluator was holding. To this, the claimant's fiancee began laughing, stating "he really crazy." When asked to count backwards from 20, the claimant omitted numbers 17, 15, 12, 6, 5 and 4. His recent and remote memory appeared intact. * * * He was able to recall 3 of 3 objects immediately and 2 of 3 objects after five minutes. When asked how many seconds were in a minute, he responded "30." When asked what you use to stay dry in the rain, the claimant states "your coat." **His overall intellectual functioning is likely within a borderline range**. His general fund of information appeared appropriate to his experience.

(Tr. 195) (emphasis added).

Dr. Hill also attempted to administer cognitive functioning testing, including the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV). (Tr. 197.) She noted Drake responded either incorrectly or that he "didn't know" to many of the questions asked during the examination. (Tr. 196.) For example, Dr. Hill reported:

> Within Block Design, the claimant would provide an incorrect response after 6 seconds, 3 seconds, and 5 seconds respectively. The claimant provided the response of "I don't know" to the demonstration item and all items presented to him in Similarities. The claimant provided only one correct response on Digit Span during the Digit Span backwards sample item, but provided all incorrect responses to all Digit Span forward items, the remaining Digit Span backwards items, and all Digit Span sequencing items. The claimant provided incorrect responses on all sample items and testing items within Matrix Reasoning. He stated "I don't know" as his response on all Vocabulary items. The claimant would respond between 1 to 3 seconds within all Arithmetic items, stating "I don't know" to each item. * * *

(*Id.*) Dr. Hill concluded "the claimant's observed behavior and purposeful effort to perform poorly on this measure invalidates the measure." (*Id.*) After attempting to perform IQ testing, Dr. Hill further found:

> The claimant's general cognitive ability was unable to be derived, as no [Full Scale IQ] score could be determined based on his lack of effort and purposeful effort to perform poorly on this measure. The only earned score from his performance on this measure resulted with a Processing Speed Index sum of scaled scores of 2, PSI of 50, with a percentile rank of <0.1. The claimant's efforts on this measure invalidated the measure. **As such, the claimant's overall cognitive abilities were unable to be measured with a standardized score, but it does not appear that the claimant has any type of deficits related to his intellectual capacity**.

(Tr. 197) (emphasis added). Later in her Assessment, she also stated that Drake's "earned scores on the WAIS-IV are considered to be invalid, as the claimant's observed behavior is reflective of malingering and his earned scores on the measure are reflective of much lower functioning than his true capabilities would suggest." (Tr. 198.)

Dr. Hill assessed malingering; antisocial personality disorder; alcohol use disorder, severe; cannabis use disorder, severe; and cocaine use disorder, severe, in reported sustained remission in a controlled environment.  (Tr. 197.)  She indicated that "no diagnosis related to the claimant's overall intellectual functioning was able to be made;" however, "based on his presentation and report of functioning, it is not believed that the claimant has any type of deficits in his intellectual capability."  (Tr. 198.)  Dr. Hill explained that her diagnosis of antisocial personality disorder was "based on his presentation within the clinical interview setting and his report of a pervasive pattern of disregard for and violation of the rights of others, where the claimant has had a failure to conform to social norms with respect to lawful behavior, has deceitfulness, failure to plan ahead, irritability, disregard for safety, constant irresponsibility, and lack of remorse."  (*Id.*)  She further concluded that "[a]lthough the claimant does allude to mental health concerns related to auditory hallucinations, the claimant's report is believed to be the claimant's intention to produce false or grossly exaggerated symptoms and does not satisfy any criteria related to a thought disorder."  (Tr. 199.)  Dr. Hill described Drake's prognosis as guarded based on his "significant malingering and antisocial behavior."  (Tr. 198.)

With regard to Drake's four work-related mental abilities, Dr. Hill concluded as follows:

**1.    Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions**.

The claimant appears able to understand, remember, and carry out instructions, as evidenced by his presentation within the clinical interview setting and his report of overall functioning.  Although the claimant does report a history of special education intervention, the claimant provides extreme inconsistencies in his reported education history and therefore without collateral information it is unclear that the claimant is being truthful in his report, as initially the claimant states that he had completed his high school education and received his high school diploma with special education intervention.  However, the claimant then provides a conflicting report during the clinical interview when prompted by his fiancée's report of him dropping out of high

school. The claimant's overall intellectual capability was unable to be determined by standardized measure based on the claimant's intentional poor performance on this measure, which invalidated the overall measure. Currently, the claimant does not provide any description of functioning reflective of an intellectual disability.

**2. Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks**.

The claimant appears able to maintain attention and concentration, maintain persistence and pace, and perform simple and multi-step tasks, as evidenced by his presentation within the clinical interview setting, his performance on the mental status exam tasks, and his report of daily functioning, as the claimant states that he is able to complete multi-step and complex tasks, such as taking the bus by himself, using the microwave, and purchasing cigarettes at the store and understanding how much change to get back. The claimant provides an inconsistent report in his overall level of functioning related to activities of daily living as compared to his collateral information. Although the claimant appears able to complete all of these tasks independently, it is believed that his characteristics of antisocial personality disorder and malingering efforts would contribute to the claimant not participating in these tasks to the best of his ability.

**3. Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting**.

The claimant appears limited in his ability to respond appropriately to supervisors and to coworkers within a work setting based on the claimant's interactions within the clinical interview and testing session and his observed behaviors, in which the claimant was attempting to perform poorly to reflect lower functioning than his true capabilities would suggest. This is consistent with antisocial personality disorder, as the claimant does report a history of difficulty in regard to conforming to social norms with respect to lawful behavior, in addition to consistent irresponsibility and lack of remorse. It is believed that the claimant's daily use of substances would also contribute to difficulties in this area. The claimant does report a history of involvement related to community violence and reports a history of incarcerations.

**4. Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

Although the claimant is likely able to respond appropriately to work pressures within a work setting, as there was no observed or reported symptoms of anxiety, the claimant is likely limited related to his antisocial personality disorder and disinterest in engaging in any type of employment. Further, the claimant reports daily use of substances that would likely contribute to his limitations in this area.

(Tr. 199-201.)

On March 11, 2015, state agency psychologist Katherine Fernandez, Psy.D., reviewed Drake's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 326-327, 328-330.) In the PRT, Dr. Fernandez determined Drake had a moderate restriction in his activities of daily living, and moderate difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 326.) In the RFC, Dr. Fernandez found Drake was not significantly limited in his abilities to:

- Remember locations and work-like procedures;

- Understand, remember, and carry out very short and simple instructions;

- Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- Sustain an ordinary routine without special supervision;

- Work in coordination with or in proximity to others without being distracted by them;

- Make simple work-related decisions;

- Ask simple questions or request assistance;

- Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

- Be aware of normal hazards and take appropriate precautions;

- Travel in unfamiliar places or use public transportation;

- Set realistic goals or make plans independently of others.

(Tr. 328-330.) Dr. Fernandez found Drake was moderately limited in his abilities to:

- Understand, remember, and carry out detailed instructions;

- Maintain attention and concentration for extended periods;

- Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- Interact appropriately with the general public;

- Accept instructions and respond appropriately to criticism from supervisors;

- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- Respond appropriately to changes in the work setting.

(*Id.*)

In the narrative section of her Assessment, Dr. Fernandez found Drake could perform 1 to 2 step simple, routine tasks in an environment without strict time or production quotas. (Tr. 329.) She concluded Drake retained the capacity to (1) interact on an occasional and superficial basis, and (2) adapt to occasional changes in a setting without demands for fast pace or high production. (Tr. 329-330.) Finally, Dr. Fernandez remarked that the consultative examiner "noted the claimant was attempting to perform poorly to reflect lower functioning than his true capabilities would suggest." (Tr. 330.)

On April 28, 2015, state agency psychologist Carl Tishler, Ph.D., reviewed Drake's medical records and completed a PRT and Mental RFC Assessment. (Tr. 41-45, 341-346, 366-371.) In the PRT, Dr. Tishler determined Drake had a mild restriction in his activities of daily living, and moderate difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 41, 342, 367.) In the RFC, Dr. Tishler reached the same

conclusions as Dr. Fernandez regarding Drake's mental functional limitations. (Tr. 43-45, 344-346, 369-371.)

### 2. Physical Impairments

On February 20, 2015, Drake underwent a physical consultative examination with Dorothy Bradford, M.D. (Tr. 182-188.) Drake reported he had previously been "stabbed in the head" and "since then he's had headaches, sees dead bodies, and can't remember things." (Tr. 182.) He reported he went to school but was illiterate. (*Id.*) Drake also reported he had no significant history of alcohol usage, and no history of illicit drug use. (*Id.*) Physical examination findings were normal. (Tr. 182-184.) On psychiatric examination, Dr. Bradford noted Drake was oriented to person, place, and time, with appropriate judgment and insight, normal recent and remote memory, appropriate mood and affect, normal language, and normal speech. (Tr. 184.) Dr. Bradford concluded as follows:

> Claimant had a traumatic brain injury and now has headaches, sees dead bodies and can't remember things. He is learning disabled. His exam today shows a well healed scalp laceration and otherwise normal exam. In my medical opinion there are no activity restrictions.

(*Id.*)

On February 27, 2015, state agency physician Leon D. Hughes, M.D., reviewed Drake's medical records and determined his physical impairments (i.e., asthma and headaches) were not severe. (Tr. 325-326.)

On April 30, 2015, state agency physician Rannie Amiri, M.D., reviewed Drake's medical records and also determined his physical impairments (i.e., asthma and intermittent headaches) were not severe. (Tr. 40.) Dr. Amiri further noted there was insufficient evidence for the period February 1997 through March 2001. (*Id.*)

21

**D.     Hearing Testimony**

At the outset of the January 12, 2016 hearing, Drake's counsel noted his concern about

certain missing records relating to Drake's alleged cognitive impairments:

> ATTY:   There was a prior claim, a prior allowance that has records that I – that are
> material to this claim and are not in that folder. I've tried. I don't know if
> it's because they're struggling to find old school records. I requested
> records from East Tech, where the claimant attended.  It's the last school
> that he attended.  The [alleged onset date] is October 1st, 1992, which was
> probably during the period when he was collecting in the past.  None of
> that's in the paper file.
>
> ALJ:     But that's – well, his [child's insurance benefit] claim applies to when he
> was 18 through when he was 22, and I have those dates as March of '97
> through March of 2001.  And then the SSI claim would be from his filing,
> correct?
>
> ATTY:   Yes, except he's — I'm, I'm alleging that the records that go back then
> because part of what he's alleging and part of– the, the record supports
> cognitive disabilities are records that the agency would have and I'm
> struggling to get and they're not in that file.
>
> ALJ:     Okay.  But they're for – it sounds like you're saying they're for treatment
> records prior to the claim period?
>
> ATTY:   It's the entire claim period when you're looking at somebody who is . . if,
> if you're looking at a [Listing] 12.05 category [for intellectual disability],
> that's still relevant because I would have to demonstrate that that
> impairment began before age 22 and I believe that the school records are
> going to be the last dispositive records of testing other than the testing that
> was done at the [consultative examination].

(Tr. 384-385.)

The ALJ then clarified that he was looking at two different time periods in the context of

Drake's CIB and SSI applications.  (Tr. 397.)  Specifically, he noted that, with respect to Drake's

CIB claim, he would be asking for information regarding the time period between March 1997

22

and March 2001. (*Id.*) With respect to Drake's SSI claim, the ALJ stated he would be asking for information since the date of Drake's SSI application; i.e., November 2014. (*Id.*)

The ALJ then proceeded to question Drake about his impairments and treatment history. Drake testified to the following:

- He filled out the disability paperwork himself but did not understand all of it. (Tr. 387.) Although he did not identify a learning disability in this paperwork, he does, in fact, have a learning disability. (Tr. 388, 397.) He took special education classes throughout high school. (Tr. 394-395.) He was not held back a grade. (*Id.*) He graduated from high school and attended his graduation ceremony. (Tr. 389-390, 394-395.) He does not remember when he graduated, but thinks it was in 1995, 1996 or 1997. (Tr. 391.)

- He lives in a house with his fiancé and mother-in-law. (Tr. 393-394.) He has not worked since his alleged onset date, October 1, 1992. (Tr. 396.)

- He was diagnosed with bipolar disorder, PTSD, personality disorder, and substance abuse disorder. (Tr. 398.) He also has a learning disability and "can't remember stuff." (Tr. 397.) Beginning in June 2015, he started receiving mental health treatment at the Centers for Family & Children. (Tr. 400.) At the time of the hearing, he was receiving mental health treatment and taking several psychiatric medications (Zoloft Depakote, Risperdal and Invega shots). (Tr. 400-402, 404-406.) One of his medications is to control his hallucinations. (Tr. 411.) He cancelled some mental health appointments because his brother was shot, and because he did not like his case worker. (Tr. 402-404.) He has not had any recent emergency room care or inpatient psychiatric hospital admissions. (Tr. 404.)

- Prior to May 2015, he was not getting mental health treatment. (Tr. 398-399.) He cannot remember, however, whether he received mental health treatment when he was younger; i.e., during the time period between March 1997 and March 2001. (Tr. 398-400.) He cannot remember if he had any emergency room care or inpatient psychiatric hospital admissions between March 1997 and March 2001. (Tr. 405.)

- He has a learning disability. (Tr. 397.) He cannot spell or read. (Tr. 419.) He was in special education classes throughout his school years. (Tr. 394-395.) He is not able to take the bus by himself because he does not know how to get places using the bus. (Tr. 418.) He does not to the grocery

23

store by himself and does not know how much change he's supposed to get when he goes to the grocery store. (Tr. 419-420.) His only household chore is taking out the garbage. (Tr. 420.) He does not cook or clean because he does not know how. (Tr. 420-421.)

- He was hit in the head with a machete two years ago, which caused brain damage. (Tr. 412-413.) He suffers from migraines. (Tr. 412, 414-415.) He has memory problems and difficulty concentrating. (Tr. 413-414.) He also has asthma. (Tr. 416.) He thinks he has asthma because he smokes a couple packs of cigarettes each day. (*Id*.) His asthma causes him to "just fall out, blank out, or anything." (Tr. 417.)

- He has a history of substance abuse. (Tr. 406-408.) He abused alcohol during an approximately six month period in 2015, drinking a couple cases of beer per day and a couple of fifths of hard liquor per week. (*Id*.) He went to an alcohol recovery program in mid-2015, and stopped drinking. (*Id*.) He also has a history of cocaine abuse. (*Id*.) It has been over 15 years since he used cocaine. (*Id*.) He has never smoked marijuana in his life. (Tr. 407.)

- He "can't work around people." (Tr. 410.) He explained that "when I be around people, I fight. I, I just go crazy when I be around people." (*Id*.) Sometimes he "goes crazy on" his fiancé and his mother-in-law. (*Id*.) By way of example, he stated he sometimes "starts running out of the house naked." (*Id*.) He has "gone crazy" on the bus. (Tr. 410-411.) He got kicked off the bus two weeks previously because "I thought I, I seen, I seen my momma. My momma gone, dead. I see my momma and start running off the bus while the bus was still moving." (Tr. 411.) He has also been asked to leave the grocery store. (Tr. 411-412.) Recently, the police were called because he "went crazy" on a man in the grocery store who looked at him like he was crazy. (*Id*.)

The ALJ determined that Drake had no past relevant work. (Tr. 396.) The ALJ then posed the following hypothetical question:

[A]s I have indicated before, there is no past relevant work in this case. However, I'd like you to consider an individual with the claimant's age, education, and past work history. Also, the individual is limited to simple, routine and repetitive tasks, but not at a production rate pace, such as on an assembly line. They can work in an environment with only occasional changes to assigned tasks or work flow and of the sort that can be learned after a short demonstration.

24

> The individual is limited to occasional, superficial interaction with coworkers and the public. And by superficial I mean they can do such things as answer questions about the time of day or provide direction to the bathroom, but those are just examples. Finally, they can have occasional interaction with supervisors, but limited to the communication of job critical information.

(Tr. 422.) The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as car washer (medium, unskilled, SVP 1); kitchen helper (medium, unskilled, SVP 2); and merchandise marker (light, unskilled, SVP 2.) (Tr. 423.)

The ALJ then asked the VE to consider the same hypothetical with the additional limitation that the individual: "can never have contact with supervisors, coworkers, or the public. Also the individual would need redirection or retraining at least three times during each workday on a consistent basis." (Tr. 423.) The VE testified "there would be no work that could be sustained under those conditions." (*Id.*)

In response to a question from the ALJ regarding employer tolerance for absenteeism, the VE testified that "in my opinion, a worker would be able to keep their job if they're absent at, at a rate of about a day or less per month averaged over a 12 month period." (*Id.*) With regard to tolerance for off-task behavior, the VE testified that "employers expect to lose some ten percent of production and right around ten percent and many employers take note and disciplinary action, most will be 15 percent." (Tr. 424.)

### III.  STANDARD FOR DISABILITY

The Social Security Act mandates the satisfaction of three basic criteria to qualify for child's insurance benefits of an insured, namely, the child must: (1) have filed an application for such benefits; (2) have been unmarried at the time of the filing and must have been either: (i) under eighteen years of age or a full time elementary or secondary school student under nineteen,

or (ii) under a disability which began before age 22; and (3) have been dependent upon the parent at the time the application was filed if the parent is still living or, if the parent is deceased, at the time of the parent's death. 42 U.S.C. § 402(d)(1).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-

(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The Appeals Council made the following findings of fact and conclusions of law:

1.    The claimant was born on March * * * 1979 and attained age 22 on March * * * 2001.  The claimant alleged an onset date on October 1, 1992, prior to age 22 (20 CFR 404.102, 416.120(c)(4), and 404.350(a) (5)).

2.    The claimant has not engaged in substantial gainful activity since October 1, 1992, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3.    The claimant has the following severe impairments: bipolar disorder, post traumatic stress disorder, personality disorder, and substance addiction disorder (20 CFR 404.1520(c) and 416.920(c).

4.    The claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.    The claimant's impairments resulted in the following limitations on his ability to perform work-related activities: work at all exertional levels reduced by simple, routine and repetitive tasks, but not at a production rate pace such as on an assembly line, occasional work changes to assigned tasks or work flow, and of the sort that can be learned after a short demonstration; occasional and superficial interaction with coworkers and the public, and occasional interaction with supervisors, but limited to the communication of job critical information.

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March * * * 1979 and was 13 years old, which is defined as a child, on the alleged disability onset date as of October 1, 1992 (20 CFR 404.1563 and 416.963).  On November 24, 2014, the date of the Supplemental Security Income application, the claimant was 35 years old. On March 27, 2015, the claimant filed an application for child's insurance benefits based on both parents' accounts: Dorothy Drake . . . who died on July ** 2005 when the claimant was 26 years old, and Donald Leonard

27

Parker . . . who filed for retirement on January * * * 2013 at which time the claimant was 33 years old.

8.    The claimant has a 12th grade education and is able to communicate in English.

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant was not under a disability, as defined in Social Security Act, prior to March * * * 2001, the date he attained age 22, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 11-14.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

28

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

As noted above, in this case, both the ALJ and the Appeals Council issued written decisions regarding Drake's CIB and SSI applications.  The Sixth Circuit has explained that "[w]here the Appeals Council denies review of the ALJ's decision, the ALJ's decision becomes the decision of the Commissioner." *Taylor v. Comm'r of Soc. Sec.*, 1996 WL 400175 at * 4 (6th Cir. July 16, 1996).  "In a case ... where the findings of the [ALJ] and the Appeals Council are in conflict, the question before us is whether substantial evidence supports the Appeals Council's decision." *Johnson v. Secretary of Health and Human Servs.*, 948 F.2d 989, 992 (6th Cir.1991)). *See also Garcia v. Comm'r of Soc. Sec.*, 732 Fed. Appx. 425, 428 (6th Cir. May 10, 2018). However, "where the Appeals Council adopted or relied on the findings of the ALJ concerning an issue, the appeal of that issue involves the findings of both the ALJ and the Appeals Council, and the substantial evidence standard of review applies to the findings regardless of whether they were made by the Appeals Council, the ALJ, or were made by the Appeals Council in reliance on the ALJ's findings." *Taylor*, 1996 WL 400175 at * fn 2. *See also Cunningham v. Colvin*,

2014 WL 7238536 at * 9 (N.D. Ohio Dec. 17, 2014); *Mader v. Astrue*, 2011 WL 2650183 at fn 6 (S.D. Ohio June 16, 2011).

Here, the Appeals Council "adopt[ed] the Administrative Law Judge's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable." (Tr. 10.) Further, the Appeals Council adopted the ALJ's findings and conclusions regarding whether Drake was disabled, specifically noting that "the Appeals Council agrees with the Administrative Law Judge's findings at steps 1 through 5 of the sequential evaluation process." (Tr. 10, 11.) The Appeals Council nevertheless issued its own written decision because the ALJ decision "does not evaluate some of the relevant medical evidence," most notably Ms. Christy's October 2015 opinion and Drake's treatment notes from the Center for Families and Children. (Tr. 11.)

Thus, to the extent the issues presented herein rely on the evidence not considered by the ALJ, the Court reviews the findings and conclusions of the Appeals Council. However, to the extent the issues presented involving findings and conclusions of the ALJ that were adopted by the Appeals Council, the Court reviews the findings of both the Appeals Council and the ALJ under the substantial evidence standard of review.

**Listing 12.05C**

Drake argues the Appeals Council improperly evaluated his intellectual disability. (Doc. No. 14.) Citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), Drake argues the Appeals Council erred as a matter of law because it failed to properly consider the fact he was previously found disabled under Listing 12.05C. Specifically, he maintains "the

existence of a prior award of benefits by the Agency based on Listing 12.05C is *critical evidence* because it is directly contrary to the Appeals Council's finding that Plaintiff does not have lifelong adaptive deficits, since the previous award based on Listing 12.05C *is the Agency's finding that Plaintiff does have lifelong mental retardation/intellectual disability with adaptive deficits*." (*Id*. at 9) (emphasis added).  Drake argues the Appeals Council failed to adequately address this issue and, further, failed to clearly identify the records on which it based its implicit determination that he did not meet or equal the Listing.  He asserts "the Appeals Council stated only that it had reviewed the Agency's 'computerized records' with respect to the Agency's previous award of benefits pursuant to Listing 12.05C, but then did not include those records (or even a description of them) in the case record." (*Id*. at 10.)  Drake argues remand is required because "it is, at best, unclear what medical records or medical opinions, if any, the Appeals Council viewed." (*Id*. at 11.)

Drake also asserts the Appeals Council improperly relied on Dr. Hill's finding of malingering.  (*Id*. at 13-16.)  He argues Agency policy disfavors diagnoses of malingering based on a one-time examination, noting Dr. Hill "did not even purport to base her malingering diagnosis upon any objective test." (*Id*. at 14.)  Drake further asserts that Dr. Hill's opinion is "even less reliable when based upon no objective basis and/or comprehensive review of the underlying record at all." (*Id*.)  Noting malingering is often associated with antisocial personality disorder, Drake argues "it is patently unreasonable for the Agency to use the more unsavory aspects of Plaintiff's personality (disorder) as a basis to deny his claim, when they actually demonstrate the seriousness of his antisocial personality disorder." (*Id*. at 15.)

The Commissioner argues the Appeals Council was not required to evaluate whether Drake met or equaled the requirements of Listing 12.05C. (Doc. No. 17.) She argues *Drummond* does not apply because Drake was previously allowed benefits after a determination at the initial level, and "*Drummond* . . . only applies where there is a prior decision made by an ALJ or the Appeals Council." (*Id.* at 12.) The Commissioner also maintains *Drummond* is inapplicable because "there was a change in the law," i.e., "Listing 12.05C in Appendix 1 was eliminated effective January 17, 2017." (*Id.*)

The Commissioner then argues the ALJ was not required to analyze Listing 12.05C because "the record did not contain any evidence establishing that Plaintiff met Listing 12.05C." (*Id.* at 13.) Specifically, she maintains (1) Drake "did not provide any school records or valid intellectual testing," (2) "the agency administered psychological testing [but] it was invalid due to exaggerated responses;" and (3) Dr. Hill concluded that Drake "did not provide any description of functioning reflecting an intellectual disability." (*Id.*) The Commissioner also asserts Drake failed to present evidence of deficits in adaptive functioning consistent with Listing 12.05C, noting evidence that he spends time with family, watches television, listens to music, talks on the phone, prepares food with a microwave, and performs general cleaning. (*Id.* at 14.)

Finally, the Commissioner argues the Appeals Council did not rely on additional, unidentified evidence but, rather, reviewed "the same evidence considered by the ALJ." (*Id.* at 15.) She maintains all efforts to find agency records regarding Drake's previous award of benefits have been unsuccessful. (*Id.*) The Commissioner argues "the prior folder from 1992 is simply not available," and argues "[r]emand will not remedy its loss." (*Id.*)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for

listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *Id.* at 416-17.

As noted above, Drake argues the Appeals Council erred in finding he did not have an intellectual disability. At the time of the ALJ's January 2016 decision, Listing 12.05C provided, in relevant part:

> **12.05 Intellectual disability**: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1. "Under each [intellectual disability] listing, including Listing 12.05(C), a claimant must establish that [his] impairment: (1) satisfies the 'diagnostic description in the introductory paragraph *and* any one of the four sets of criteria.' " *Oddo v. Astrue*, 2012 WL 7017622, *3 (N.D. Ohio Dec. 10, 2012) (quoting 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00(A)) (emphasis in original), adopted by, *Oddo v. Comm'r of Soc. Sec.*, 2013 WL 486276 (N.D. Ohio Feb. 6, 2013); *see also Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Thus, at the time of the ALJ's January 2016 decision,[10] Drake was required to show that he had: "(1) significantly subaverage general intellectual functioning with deficits in adaptive functioning prior to age twenty-two; (2) a valid verbal, performance, or full scale IQ of 60 to 70; and (3) another physical or mental impairment imposing an additional and significant work-related limitation of function," in order to meeting Listing 12.05C. *Peterson v. Comm'r of Soc. Sec.*, 552 F. Appx 533, 539 (6th Cir. 2014) (citing 20 C.F.R. Pt. 404, Subpt. P, Appx 1, §§ 12.00A, 12.05C).

Subsequent to the ALJ's decision, the Social Security Administration revised the criteria in the Listing of Impairments that are used to evaluate claims involving mental disorders in adults under Titles II and XVI of the Social Security Act. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 (Sept. 26, 2016) (codified at 20 C.F.R. §§ 404 and 416). These new rules became effective on January 17, 2017. *Id.* Specifically, the Agency explained that "[w]hen the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date." *Id.*

The version of Listing 12.05 in effect at the time of the Appeals Council's September 2017 Decision[11] provides as follows:

---

[10] The Court further notes that, as the Appeals Council explained, "at the time the claimant was [previously] found disabled, section 12.05C described mental retardation with IQ scores between 60 and 70, as well as another significant impairment." (Tr. 11.)

[11] The Commissioner's statement "Listing 12.05C in Appendix 1 was eliminated effective January 17, 2017" is disingenuous, at best. (Doc. No. 17 at 12.) In the Revised Criteria for Evaluating Mental Disorders, the Agency explains that: "We reorganized the requirements of listing 12.05 to reflect the three diagnostic criteria for intellectual disability from the DSM-5 and the AAIDD. Listing 12.05 now has two paragraphs:

**12.05 Intellectual disorder** (see 12.00B4), satisfied by A or B:

A. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and

2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

---

12.05A for claimants whose cognitive limitations prevent them from being able to take a standardized intelligence test and 12.05B for claimants who are able to take a standardized intelligence test. Paragraphs 12.05A and 12.05B each have three criteria that match the diagnostic criteria for intellectual disability and that describe the evidence that we need to satisfy the criteria." *See* 81 Fed. Reg. 66138-01 at 66150. The Agency later explains: "The changes clarify that there are three criteria that must be satisfied in order for an impairment to meet one of these listings. The three criteria, restated here, are: 1. significantly subaverage general intellectual functioning, 2. significant deficits in adaptive functioning, and 3. evidence demonstrating or supporting the conclusion that the disorder began prior to age 22." *Id*. "We will use final listing 12.05B to evaluate the claims of people who are able to take a standardized intelligence test. Like final listing 12.05A, final listing 12.05B has three subparagraphs; there is one subparagraph for each element of the medical definition of intellectual disability. The first subparagraph requires a claimant to have obtained either: A full scale IQ score of 70 or below, or a full scale IQ score of 71 through 75 accompanied by a verbal or performance IQ score of 70 or below. . . . . The second sub-paragraph requires that a claimant have extreme limitation of one, or marked limitation of two, of the four "paragraph B" areas of mental functioning . . . The last sub-paragraph requires evidence that demonstrates or supports the conclusion that the disorder began prior to age 22. If a claimant's impairment satisfies the requirements in all three sub-paragraphs, we will find that the claimant's impairment meets the criteria for listing 12.05B." Finally, the Agency states that "Final 12.00H is a new section that brings together the rules pertaining to listing 12.05, intellectual disorder." Thus, while the Commissioner is technically correct that Listing 12.05C was "eliminated," she fails to mention that this was the result of the Agency's reorganization of Listing 12.05. As noted above, the current version of Listing 12.05 still requires claimants to demonstrate significantly subaverage intellectual functioning, deficits in adaptive functioning, and onset prior to the age of 22.

OR

B. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evidenced by a or b:

a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 12.00E1); or

b. Interact with others (see 12.00E2); or

c. Concentrate, persist, or maintain pace (see 12.00E3); or

d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

Listing 12.05.

As the Appeals Council adopted the ALJ's findings and conclusions at steps one through five of the sequential process, the Court discusses the decisions of both the ALJ and the Appeals Council as they relate to Drake's allegations of intellectual disability. In the January 2016 decision, the ALJ found Drake suffered from the following severe impairments at step two: bipolar disorder, PTSD, personality disorder, and substance addiction disorder. (Tr. 25.) At this step, the ALJ determined Drake did not suffer from a learning disability. (Tr. 25.) The entirety of the ALJ's discussion of this condition at step two is as follows:

> Finally, I note that the claimant alleges a learning disability. However, there is no medical evidence of record to substantiate this as a medically determinable impairment.

(*Id.*) At step three, the ALJ considered whether Drake met or equaled the requirements of Listings 12.04, 12.06, 12.08 and 12.09. (Tr. 25-27.) The ALJ did not evaluate whether Drake met or equaled the requirements of Listing 12.05C. (*Id.*)

At step four, the ALJ noted Drake's statements that he "graduated high school and attended the graduation ceremony but had special classes." (Tr. 28.) The ALJ also acknowledged Drake's allegations of hallucinations but found "they are not reported in the treatment notes." (*Id.*) The ALJ found "little evidence of the medical evidence of record of substantial impairment," noting "the claimant has had little in the way of mental health treatment." (Tr. 29.) The only specific mental health treatment record discussed by the ALJ at step four is Drake's March 2015 adult intake assessment. (Tr. 31.)

The ALJ then considered the opinion evidence of record. The ALJ first accorded "significant weight" to the opinion of state agency psychologist Dr. Tishler that Drake is limited to 1 to 2 step simple repetitive tasks in an environment without strict time or production quotas; with the ability to interact on occasional and superficial basis; and with the ability to adapt to occasional, superficial interaction with coworkers and the public. (Tr. 30.) The ALJ then considered the opinion of psychological consultative examiner, Dr. Hill. (Tr. 30-31.) The ALJ recited, at length, Dr. Hill's findings and conclusions, including her conclusions that (1) Drake had a tendency to intentionally produce false or exaggerated symptoms; (2) Drake's overall intellectual functioning was likely within a borderline range; (3) a full scale IQ could not be determined because of Drake's lack of effort and purposeful effort to perform poorly, but it did

not appear that Drake had any type of deficits related to intellectual capacity; and (4) Drake did not provide any description of functioning reflective of an intellectual disability. (*Id*.) Without further elaboration, the ALJ found that "these conclusions are supported by the medical evidence of record to the extent reflected in the above residual functional capacity." (Tr. 31.) The ALJ found Drake was not disabled prior to March 2001, the date he attained age 22, through the date of his decision. (Tr. 34.)

The Appeals Council then granted review and issued a written decision on September 27, 2017. (Tr. 10-15.) At the outset, the Appeals Council noted as follows:

> We note that the claimant had previously been found disabled during the period at issue. However, we could not secure his prior file, but the issue remains whether the claimant continued to be disabled throughout the date of the Administrative Law Judge's decision. Computerized records indicate that the claimant was found disabled under section 12.05C of Appendix 1 to 20 CFR Part 404. The mental impairments listed in Appendix 1 have changed, but at the time the claimant was found disabled, section 12.05C described mental retardation with IQ scores between 60 and 70, as well as another significant impairment. Current records show that the claimant does not have an intellectual impairment of the degree of severity contemplated by that section, and so the Appeals Council will not apply collateral estoppel to find him disabled during the period at issue.

(Tr. 11.) The Appeals Council then discussed Drake's treatment records from the Center for Families and Children, and Ms. Christy's October 2015 opinion regarding Drake's mental functional limitations. (Tr. 11-12.) The Appeals Council accorded "little weight" to Ms. Christy's opinion "because it is not supported by the Center for Families treatment notes and the preponderance of the medical evidence of record." (Tr. 12.) The Appeals Council also discussed Dr. Hill's report, as follows:

> On February 26, 2015, Ms. Amber Hill, Ph.D., the psychological consultative examiner, evaluated the claimant finding no evidence of hallucinations, slight restricted affect, intact memory, and poor effort at the time on the cognitive

subtest presented to him. Therefore, the claimant's cognitive abilities were not measured with a standardized core, but in Dr. Hill's opinion, the claimant did not appear to have any type of deficits related to his intellectual capability (Exhibit 3F). Dr. Hill rendered a diagnosis of malingering, antisocial personality disorder, and alcohol/cannabis use (Exhibit 3F, page 8).

(Tr. 12.)

The Appeals Council then found that Drake's mental impairments did not meet or medically equal the criteria of Listings 12.04, 112.04, 12.06, 112.06, 12.08, and 112.08. (*Id.*) The Appeals Council did not consider whether Drake met or medically equaled the requirements of Listing 12.05. Lastly, the Appeals Council concluded as follows:

We have considered the claimant's subjective complaints, the activities of daily living, the medical history, the medical opinions of record and the claimant's legal representative's brief dated August 1, 2017. In sum, the evaluation of this additional evidence mentioned above and contained in the claimant's record for review at the hearing level justifies a conclusion that his impairments are not more limiting than found by the Administrative Law Judge's decision on January 28, 2016. Accordingly, the Appeals Council adopts the Administrative Law Judge's findings with respect to steps 1 through 5 of the sequential evaluation process referenced above.

(*Id.*)

For the following reasons, the Court finds the Appeals Council and ALJ erred in failing to evaluate Drake's alleged intellectual disability under Listing 12.05. Reading both decisions as a whole, it appears the Appeals Council and ALJ elected not to address Listing 12.05 primarily on the basis of Dr. Hill's report. As discussed *supra*, Dr. Hill conducted a consultative psychological examination of Drake in February 2015. (Tr. 190-201.) Dr. Hill assessed "significant malingering and antisocial behavior." (Tr. 198.) She also noted Drake was not currently receiving mental health treatment; was "engaging in excessive amounts of substance use daily;" and was "not engaged in any type of alcohol or drug treatment program." (Tr. 192-

41

193, 198.) Of particular relevance to Drake's cognitive functioning, Dr. Hill reached the following findings and conclusions:

- On cognitive functioning testing, Drake "was purposefully providing incorrect responses;"

- "His attitude towards the evaluation appeared to be cooperative, but it was evident that the claimant was purposefully attempting to perform poorly on the measure, as the claimant did not make any effort on any subtest presented to him;"

- "The claimant's observed behavior and purposeful effort to perform poorly on [cognitive testing] invalidates the measure. Although it appeared that he recalled and understood instructions, he was observed as deliberately failing to attend to these items;"

- "His overall intellectual functioning is likely within a borderline range;"

- "The claimant's general cognitive ability was unable to be derived, as no [Full Scale IQ] score could be determined based on his lack of effort and purposeful effort to perform poorly on this measure. The only earned score from his performance on this measure resulted with a Processing Speed Index sum of scaled scores of 2, PSI of 50, with a percentile rank of <0.1. The claimant's efforts on this measure invalidated the measure. As such, the claimant's overall cognitive abilities were unable to be measured with a standardized score, but it does not appear that the claimant has any type of deficits related to his intellectual capability;"

- Drake's "earned scores on the WAIS-IV are considered to be invalid, as the claimant's observed behavior is reflective of malingering and his earned scores on the measure are reflective of much lower functioning than his true capabilities would suggest."

(Tr. 193-198.)

Dr. Hill assessed malingering; antisocial personality disorder; alcohol use disorder, severe; cannabis use disorder, severe; and cocaine use disorder, severe, in reported sustained remission in a controlled environment. (Tr. 197.) She indicated that "no diagnosis related to the claimant's overall intellectual functioning was able to be made;" however, "based on his

presentation and report of functioning, it is not believed that the claimant has any type of deficits in his intellectual capability." (Tr. 198.) Dr. Hill explained that her diagnosis of antisocial personality disorder was "based on his presentation within the clinical interview setting and his report of a pervasive pattern of disregard for and violation of the rights of others, where the claimant has had a failure to conform to social norms with respect to lawful behavior, has deceitfulness, failure to plan ahead, irritability, disregard for safety, constant irresponsibility, and lack of remorse." (*Id.*)

Under the particular circumstances presented herein, the Court finds it was error for the Appeals Council and ALJ to fail to address whether Drake met or equaled the requirements of Listing 12.05. Dr. Hill examined Drake on February 26, 2015. (Tr. 190.) At that time, Drake had recently been released from prison and was significantly abusing alcohol and drugs. Indeed, both Drake and his fiancee reported he was drinking 24 beers plus hard liquor and wine, on a daily basis. (Tr. 192.) It is also undisputed that, at the time of his evaluation with Dr. Hill, Drake was not receiving any mental health treatment and not taking any psychiatric medications. (Tr. 193.) In fact, Drake reported he was suffering from hallucinations.[12] (*Id.*)

---

[12] Dr. Hill concluded that "[a]lthough the claimant does allude to mental health concerns related to auditory hallucinations, the claimant's report is believed to be the claimant's intention to produce false or grossly exaggerated symptoms and does not satisfy any criteria related to a thought disorder." (Tr. 199.) Subsequent to Dr. Hill's examination, Drake sought mental health treatment at the Center for Families and Children, where he consistently reported auditory and visual hallucinations between March and November 2015. Unlike Dr. Hill, Drake's mental health treatment providers at the Center did not believe Drake was malingering or purposely exaggerating this symptoms. Rather, his providers prescribed him four psychiatric medications, including one (Invega Sustenna) that was specifically designed to address his hallucinations.

Although Drake answered incorrectly or responded "I don't know" to virtually all of the questions presented to him on cognitive testing, Dr. Hill concluded the results of his testing were invalid because Drake was "purposefully providing incorrect answers" and "purposefully attempting to perform poorly on the measure." (Tr. 193-198.) Further, while the only earned score from Drake's IQ test placed him within a percentile rank of <0.1, Dr. Hill invalidated his IQ testing due to his "lack of effort and purposeful effort to perform poorly on this measure." (Tr. 197.) Dr. Hill determined, without further elaboration or testing, that Drake does not have "any type of deficits related to his intellectual capability." (*Id*.) The Court notes, however, that this statement is inconsistent with Dr. Hill's own finding (contained in the same report) that Drake's "overall intellectual functioning is likely within a borderline range." (Tr. 195.) Dr. Hill does not offer any explanation for this inconsistency.

Shortly after Dr. Hill's examination, Drake sought and received mental health treatment at the Centers for Families and Children. The record reflects he received mental health treatment between March and December 2015, including counseling and treatment with Zoloft, Depakote, Risperdal, and Invega Sustenna. (Tr. 206-208, 256-259, 243-244, 267-268, 270-271, 277-278, 279-280, 287-288, 289-290, 302-303, 309-310.) Treatment records also indicate Drake reported he had stopped drinking and abusing drugs. (Tr. 267-268, 270-271, 277-278, 279-280, 309-310.) Neither the Appeals Council nor the ALJ considered the possibility that Dr. Hill's conclusions and findings might be affected by the fact that Drake subsequently received ongoing mental health treatment and stopped drinking and using drugs.

This is particularly concerning given that the very behavior that Dr. Hill uses to discredit Drake appears (by Dr. Hill's own admission) to be a symptom of his anti-social

personality disorder.  As noted above, Dr. Hill diagnosed Drake with anti-social personality disorder and identified a pattern of disregard for the rights of others, deceitfulness, failure to conform to social norms, irritability, constant irresponsibility and lack of remorse as symptoms of this disorder.  (Tr. 198.)  She found Drake's "characteristics of antisocial personality disorder and malingering efforts would contribute to the claimant not participating in [work] tasks to the best of his ability."  (Tr. 200.)  In other words, Dr. Hill herself concluded Drake's mental impairments contributed to his failure to participate in assigned tasks "to the best of his ability." (*Id*.)  And, yet, she invalidated Drake's cognitive functioning and IQ testing and found he did not have "any type of deficits related to his intellectual capability" based on his lack of effort. Neither the Appeals Council nor the ALJ considered the possibility that Drake's subsequent mental health treatment (and sobriety) might impact the ability of a consultative examiner to obtain valid cognitive test results.

The failure of the Appeals Council and ALJ to consider Listing 12.05 is also problematic given other evidence in the record suggesting Drake suffers from a learning disability.  Specifically, although Drake gave conflicting information regarding his educational history, he consistently reported that he was illiterate and had received special education services throughout his school years.  (Tr. 182, 191, 206-208, 258, 394-395, 419.)  Treatment records also reflect Drake's providers expressed concern regarding his cognitive abilities, and indicate he exhibited confusion regarding basic concepts such as the meaning of daylight savings time.  (Tr. 258, 302-303, 309-310.)  Moreover, Drake testified he was not able to take the bus by himself because he does not how to get places using the bus, and does not go the grocery store by himself because he doesn't know how much change he is supposed to get.  (Tr. 418-419.)  He

also testified his only household chore is taking out the garbage, because he does not how to cook or clean.  (Tr. 420-421.)

Finally, neither the Appeals Council nor the ALJ meaningfully address the significance of the fact that Drake was found previously disabled as a child based on Listing 12.05C.  As the Appeals Council itself acknowledged, "at the time claimant was found disabled, section 12.05C described mental retardation with IQ scores between 60 and 70, as well as another significant impairment."  (Tr. 11.)  Thus, at some point in his childhood, Drake was found to have significantly subaverage intellectual functioning, as demonstrated by an IQ score between 60 and 70.  As discussed above, one of the criteria for establishing intellectual disability under the versions of the Listing that were in effect at the time of the Appeals Council and ALJ decisions is that the intellectual "disorder began prior to your attainment of age 22."  The Court agrees with Drake that his previous award of disability under Listing 12.05C is a significant piece of evidence that should have been more carefully considered below.

The Commissioner suggests remand is pointless because Agency records regarding Drake's previous award of disability are "simply not available" and "remand will not remedy [this] loss."  (Doc. No. 17 at 15.)  It is, indeed, regrettable that the Agency appears to have lost all records regarding Drake's previous award of disability, despite the fact that alleges he was continuously receiving disability benefits for at least sixteen years (i.e., from before he turned 18 years old until the age of 34.)  However, the Court disagrees that remand would serve no purpose.

Rather, and under the unusual and particular circumstances presented herein, the Court finds this matter should be remanded for the ALJ to order an updated psychological consultative

examination (including IQ testing), in light of Drake's regular mental health treatment and medication.  On remand, the ALJ should also make every possible effort to locate any and all records relating to Drake's previous award of disability, including school records, treatment records, and the results of any previous IQ testing.  The ALJ should document and explain all efforts made to locate these records.  If agency records regarding Drake's previous award of disability cannot be located, the ALJ should make a reasonable effort to assist Drake's counsel in locating and obtaining relevant school and treatment records, if any.  Further, in any written decision, the ALJ and Appeals Council should clearly identify the records that were reviewed and formed the basis of the decision.[13]  Finally, on remand, the ALJ should give due consideration to whether Drake meets or equals the requirements of Listing 12.05.

As this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Drake's remaining assignments of error.

---

[13] In this regard, the Court notes the ALJ decision failed to include a List of Exhibits that identified the specific records that formed the administrative record before him.  In addition, the Court agrees with Drake that there is some ambiguity in the Appeals Council's unexplained reference to "computerized records indicating the claimant was [previously] found disabled under section 12.05C."  (Tr. 11.)  In any future written decisions, the specific records and exhibits considered should be clearly identified to allow for meaningful appellate review.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and the

matter is REMANDED for further proceedings consistent with this decision.

**IT IS SO ORDERED.**


  *s/Jonathan D. Greenberg*

Jonathan D. Greenberg
United States Magistrate Judge

Date: September 28, 2018